**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOEL A. BRODSKY,<br><br>Plaintiff,<br><br>v.<br><br>MICHELLE PALARO, JASON STRZELECKI, WILLIAM ELWARD, SAMANTHA LAROWE-KERINS, MICHAEL RENZI, COLLEEN GRIFFIN, JON WALTERS, CHRISTOPHER KOCH, and JAMES GLASGOW,<br><br>Defendants. | ) | No. 25 C 10436<br><br>Judge Sara L. Ellis |

**<u>OPINION AND ORDER</u>**

Plaintiff Joel A. Brodsky brings this case against Michelle Palaro, Jason Strzelecki, Samantha Larowe-Kerins, and Michael Renzi (the "Public Defender Defendants"); Colleen Griffin, Jon Walters, Christopher Koch, and James Glasgow (the "Prosecutor Defendants"); and William Elward. Brodsky alleges that Defendants violated his First Amendment rights by obtaining an unconstitutional gag order prohibiting him from speaking publicly about his legal representation of Drew Peterson, in violation of 42 U.S.C § 1983. Defendants have now moved to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

The Court finds that absolute prosecutorial immunity bars Brodsky's claim against Elward and the Prosecutor Defendants. Additionally, the Court finds that Brodsky has failed to state a claim against the Public Defender Defendants because he does not plausibly allege that they were acting under color of state law. For these reasons, the Court grants the motions to dismiss.

## BACKGROUND

### I. Factual Allegations[1]

From 2009 to 2012, Brodsky was the lead attorney representing Drew Peterson in "the highest profile murder case in the history of Will County, Illinois." Doc. 7 ¶ 20. After Peterson's conviction, and while his post-conviction petition was still pending, Brodsky "spoke publicly about the Peterson case with WGN News." *Id.* ¶ 26. Two days later, the Public Defender Defendants—Peterson's counsel at the time—filed an emergency motion requesting that the circuit court impose a gag order on Brodsky. The Prosecutor Defendants joined this motion. The circuit court granted the motion and issued an interlocutory gag order enjoining Brodsky from sharing "any information regarding such representation, or any information obtained in the course of such representation**,** to any media outlet or to any individuals other than his own counsel." *Id.* ¶ 35.

Brodsky appealed, challenging the scope of the gag order. In addressing this issue, the Illinois appellate court stated the following:

> We must first acknowledge the obvious. The disclosures prohibited by the circuit court's order are protected by the attorney-client privilege. According to the May 19, 2022, order, Brodsky is enjoined from "speaking about his *representation* of Mr. Peterson and from disseminating or disclosing any information regarding such *representation*, or any information obtained in the course of such *representation*." We are confident that the gag order is easily read to forbid exactly what Brodsky threatened to

---

[1] The Court takes the facts in the background section from Brodsky's complaint and presumes them to be true for the purpose of resolving Defendants' motions to dismiss. *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013). Although the Court normally cannot consider extrinsic evidence without converting a motion to dismiss into one for summary judgment, *Jackson v. Curry*, 888 F.3d 259, 263 (7th Cir. 2018), the Court may consider "documents that are central to the complaint and are referred to in it" in ruling on a motion to dismiss, *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

> do—take his case to the media in violation of the attorney-client privilege—**and no more**.

*Id.* ¶ 36. According to Brodsky, this language "clearly modified and limited the scope of the May 19, 2022 gag order," freeing him to speak publicly about "any aspect of his representation of Peterson" not protected by the attorney-client privilege. *Id.* ¶ 37.

On February 28, 2024, Brodsky gave another public interview in which he spoke about his representation of Peterson. *Id.* ¶ 39. As a result of this interview, the Public Defender Defendants and Prosecutor Defendants brought a petition for adjudication of indirect criminal contempt against Brodsky. Brodsky alleges that this petition "was brought to intimidate and frighten [him]" into not speaking about "the unconstitutional and corrupt misconduct which occurred in the Peterson trial." *Id.* ¶ 42. The circuit court subsequently appointed Elward as special prosecutor in the contempt proceedings, which Brodsky alleges only furthered the scheme to silence him.

After Elward's appointment, Elward called Brodsky on March 31, 2024 to inform him that Elward "would drop the criminal contempt case if [Brodsky] agreed not to talk to anyone about any aspect of the Drew Peterson case." *Id.* ¶ 45. Elward also allegedly indicated during this call "that he had no evidence that [Brodsky] had violated the attorney-client privilege." *Id.*

On April 1, 2024, Elward informed the circuit court that Brodsky had yet again publicly spoken about the Peterson case. The circuit court reminded Brodsky "not to discuss any part of Drew Peterson's case," informing him that he could face incarceration if he continued to speak about it. *Id.* ¶¶ 46–47. That same day, Elward also "stated in court and on the record that if [Brodsky] spoke about th[e] contempt case or the Peterson case going forward, [he] could be incarcerated." *Id.* ¶ 47. Brodsky alleges that Elward "knew that there was no legal or factual

basis for his threat" and nonetheless "made this statement with the intent to intimidate [Brodsky] [and] to deprive him of his rights under the Frist [sic] Amendment." *Id.*

Three days later, on April 4, 2024, the circuit court "re-affirmed and expanded the gag order" at Elward's request, ordering Brodsky "not make any comments regarding Drew Peterson and any proceedings as it relates to this Indirect Criminal Contempt to anyone outside the courtroom." *Id.* ¶ 48. The court stated on the record: "Don't talk about anything dealing with the case or what happens in here outside of those doors;" "Let me make this clear, Mr. Brodsky, when you go out those doors—don't talk to anybody;" and "No, my order is that you not talk to anybody outside of these walls." *Id.* Brodsky informed the court that this was "blatantly unconstitutional." *Id.* ¶ 49.

Brodsky filed a motion to dissolve this new gag order, which the circuit court denied. After Brodsky appealed this denial, Elward "engaged into a series of Kafkaesque misrepresentations on the record denying" the existence of an April 2024 gag order. *Id.* ¶ 52. The Illinois appellate court disagreed, finding that an April 2024 gag order did exist and vacating it as an unconstitutional prior restraint on Brodsky's freedom of speech.

## II. Procedural History and Scope of the Case

In the complaint, Brodsky originally alleged that Defendants (1) violated his First Amendment rights by obtaining the April 2024 gag order and (2) violated his Fifth and Fourteenth Amendment rights to due process of law and to be free of false charges, malicious charges, and abusive process by "bringing and prosecuting" the criminal contempt proceedings against him. *Id.* ¶¶ 2–4. He asserted claims under 42 U.S.C § 1983 and 42 U.S.C § 1985 for monetary damages, writing in his complaint that he did not bring "a collateral attack on the state court proceedings in Will County, Illinois" because he did not seek injunctive or declaratory

relief. *Id.* ¶ 7. Undermining this assertion, however, was the fact that he also brought an Illinois Citizens Participation Act ("ICPA") claim seeking an order "directing that the Defendants cause an order to be entered dismissing the [criminal contempt proceedings] with prejudice." *Id.* at 31.

After filing his complaint, Brodsky filed multiple motions asking the Court to stay the state court criminal contempt proceedings until after resolution of the ICPA claim. *See* Doc. 41; Doc. 45; Doc. 57. The Court denied these motions, informing Brodsky that the Court did not have jurisdiction to interfere in the contempt proceedings. *See* Doc. 70 at 8–10.

After Defendants filed the instant motions to dismiss, Brodsky responded and claimed that Defendants "are operating under a profound misunderstanding of the Plaintiff's claim." Doc. 84 at 2. In particular, he wrote:

> The Plaintiff's claim in his initial complaint is based on the violation of his First Amendment right to freedom of speech as a result of the April 4, 2024 gag order . . . . **Plaintiff[']s claim in the current complaint against the Defendants is based on this violation of his constitutional rights, and nothing more**. . . . To the extent that Plaintiff's complaint caused this confusion because it contains a long recitation of events he sincerely apologizes.

*Id.* at 3. Brodsky is the master of his complaint, *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 387 (1987), and the Court will accept his characterization of his claims when ruling on the motion to dismiss. The Court therefore construes the complaint as solely asserting a § 1983 claim based on the alleged "violation of [Brodsky's] First Amendment right to freedom of speech as a result of the April 4, 2024 gag order." Doc. 84 at 4.[2]

---

[2] To the extent that Brodsky's statements left any doubt as to the scope of his claims, he also failed to respond to Defendants' substantive arguments in favor of dismissing his § 1985 and ICPA claims, thus abandoning them. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) (holding that a plaintiff "effectively abandons" his claims "by not responding to alleged deficiencies in a motion to dismiss").

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(1) challenges the Court's subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). The standard of review for a Rule 12(b)(1) motion to dismiss depends on whether the defendant raises a facial or factual challenge. *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). If a defendant challenges the sufficiency of the allegations regarding subject matter jurisdiction—a facial challenge—the Court "must accept all well-pleaded factual allegations as true and draw all reasonable inferences" in the plaintiff's favor. *Id.* "[W]hen evaluating a facial challenge to subject matter jurisdiction," the Court employs the *Twombly–Iqbal* "plausibility" standard, "which is the same standard used to evaluate facial challenges to claims under Rule 12(b)(6)." *Id.* at 174. If, however, the defendant contests the truth of the jurisdictional allegations—a factual challenge—the Court may look beyond the pleadings and view any competent proof submitted by the parties to determine if the plaintiff has established subject matter jurisdiction by a preponderance of the evidence. *See id.* at 173; *Apex Digit., Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 444–45 (7th Cir. 2009); *Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 543 (7th Cir. 2006).

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th

Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

### I. Subject Matter Jurisdiction

#### A. Abstention Doctrines

The Court must first analyze whether to abstain from exercising jurisdiction over Brodsky's claim. *See Greening v. Moran*, 953 F.2d 301, 304 (7th Cir. 1992) ("To say that abstention is in order then is to say that federal courts should not address the merits, period. . . . When there is an ongoing state proceeding, whether to abstain is the *first* question, and an affirmative answer brings the case to an end."). "Abstention from the exercise of federal jurisdiction is the exception, not the rule." *SKS & Assocs., Inc. v. Dart*, 619 F.3d 674, 677 (7th Cir. 2010) (citation omitted). "Under established abstention doctrines, however, a federal court may, and often must, decline to exercise its jurisdiction where doing so would intrude upon the independence of the state courts and their ability to resolve the cases before them." *Id.* For example, federal courts must "refrain from exercising jurisdiction over federal constitutional claims that seek to interfere with or interrupt ongoing state proceedings." *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1071 (7th Cir. 2018) (citation omitted). While the Supreme Court has recognized four primary categories of abstention,[3] a case need not be a "literal or perfect fit" with one of these categories to warrant abstention. *J.B. v. Woodard*, 997 F.3d 714, 722 (7th Cir. 2021). General "principles of equity, comity, and federalism [that are] foundational

[3] *See R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941); *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943); *Younger v. Harris*, 401 U.S. 37 (1971); *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976).

to our federal constitutional structure" may still require the Court to abstain from exercising jurisdiction. *Id.*

Understandably, Defendants' arguments regarding abstention originally addressed much broader claims than the sole § 1983 claim Brodsky now asserts. *See, e.g.*, Doc. 54 at 7 ("Brodsky's claims are inextricably linked to the Contempt Petition and the state court's determination of whether he violated its 2022 gag order[.]"); Doc. 56 at 8 ("Plaintiff brings this action for money damages alleging the Will County Prosecutors filed the criminal contempt charge without probable cause to believe that he had violated the May 2022 Gag Order[.]"); Doc. 63 at 6 ("Plaintiff's claims . . . stem from his ongoing Criminal Contempt Case out of Will County, for violating the May 2022 gag order."). The Court need not address these arguments because Brodsky concedes in his response that abstention doctrines would prevent the Court from exercising jurisdiction over these broader claims. Doc. 84 at 5. The issue, therefore, is whether abstention doctrines require the Court to abstain from exercising jurisdiction over Brodsky's narrower § 1983 claim stemming solely from the April 4, 2024 gag order.

While Defendants argue in their replies that the Court should abstain from exercising jurisdiction even over Brodsky's narrowed claim, the Court does not find their arguments persuasive. First, Defendants argue that Brodsky has previously represented that he "***will be bringing claims*** based, in part," on the criminal contempt proceedings in the future. Doc. 85 at 3; Doc. 86 at 4 ("[Brodsky] explicitly states his intention to pursue a claim based on the initiation of the Criminal Contempt Case if he prevails in that proceeding."). But unless and until Brodsky asserts these hypothetical future claims, any potential interference with state court proceedings stemming from these claims is simply not relevant to the instant abstention analysis. And while the Prosecutor Defendants argue that the future addition of these claims "would require the

parties to restart discovery" in this case, Doc. 86 at 5, they provide no authority to support the proposition that this potential inconvenience warrants abstention, *see Puffer v. Allstate Ins. Co*., 675 F.3d 709, 718 (7th Cir. 2012) (holding that a party waives an argument if it is "underdeveloped, conclusory, or unsupported by law"); *Gross v. Town of Cicero*, 619 F.3d 697, 704 (7th Cir. 2010) ("[I]t is not this court's responsibility to research and construct the parties' arguments.").

The Prosecutor Defendants also argue that Brodsky's narrowed claim threatens to interfere with the ongoing criminal contempt proceedings because "it would subject Special Prosecutor Elward to discovery in this action" and "distract[] Special Prosecutor Elward's attention to this action and away from the" state court proceedings. Doc. 86 at 3. The Prosecutor Defendants do not provide any authority supporting such a broad and attenuated interpretation of interference, and the Court declines to adopt such a view. Requiring Elward to engage in discovery and direct at least some of his attention towards this case will not unduly interfere with the criminal contempt proceedings; these are simply the basic requirements asked of any litigant in federal court.

For these reasons, the Court is not required to abstain from exercising jurisdiction over Brodsky's claim.

**B. Ripeness of § 1983 Claim**

Defendants also argued in their motions to dismiss that Brodsky's claims were unripe, given the ongoing criminal contempt proceedings. *See* Doc. 56 at 14 ("Plaintiff's alleged injury – unlawfully prosecuting him for protected speech – depends on how the Criminal Contempt Case is resolved. If the state court rules that Plaintiff's remarks violated the May 2022 Gag Order, then no injury can exist because First Amendment protections do not extend to speech

that violates the law."). While this argument was largely rendered moot when Brodsky clarified the scope of his claims, the Public Defender Defendants nonetheless maintain that the narrower claim "remains premature." Doc. 85 at 4. The Court must address this argument before turning to the merits of Brodsky's claim because "[f]ederal courts lack jurisdiction to consider an unripe claim." *Kathrein v. City of Evanston*, 636 F.3d 906, 915 (7th Cir. 2011).

For a claim to be ripe, an actual injury must have occurred that results in a valid case or controversy. *Church of Our Lord & Savior Jesus Christ v. City of Markham*, 913 F.3d 670, 676 (7th Cir. 2019) ("The ripeness doctrine arises out of the Constitution's case-or-controversy requirement, as claims premised on uncertain or contingent events present justiciability problems."). In evaluating a claim for ripeness, courts consider "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Sweeney v. Raoul*, 990 F.3d 555, 560 (7th Cir. 2021) (citation omitted). "Plain and simple, ripeness is 'peculiarly a question of timing.'" *Id.* (citation omitted). Courts must avoid merely advisory decisions that "would [inappropriately] consume judicial time in order to produce a decision that may turn out to be irrelevant." *Lear Corp. v. Johnson Elec. Holdings Ltd.*, 353 F.3d 580, 583 (7th Cir. 2003).

Here, the Public Defender Defendants argue that "because the trial court has not determined whether Brodsky's conduct in February 2024 violated a prior 2022 gag order, his alleged injury remains premature, his claim remains unripe, and the Moving Defendants are entitled to dismissal." Doc. 85 at 4. This is not persuasive. While the Court agrees that any claim based on Brodsky's alleged violations of the May 2022 gag order would be premature, those claims do not fall within the scope of this case. As clarified in his response, Brodsky's alleged injury stems only from the April 4, 2024 gag order. The state appellate court already

vacated this order as an unconstitutional prior restraint on Brodsky's freedom of speech, and the alleged injury resulting from this order has already occurred, making Brodsky's claim ripe for review.

## II. Failure to State a Claim

### A. Elward and the Prosecutor Defendants

Having determined that subject matter jurisdiction exists in this case, the Court can properly consider the merits of Brodsky's claim. The Court first addresses Elward's and the Prosecutor Defendants' argument that absolute prosecutorial immunity bars the § 1983 claim asserted against them. In determining whether Elward or the Prosecutor Defendants enjoy absolute immunity for their actions, the Court applies a "functional approach which looks to the nature of the function performed, not the identity of the actor who performed it." *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993) (citations omitted) (internal quotation marks omitted). "A prosecutor is absolutely immune from suit for all actions and decisions undertaken in furtherance of his prosecutorial duties." *Fields v. Wharrie*, 672 F.3d 505, 510 (7th Cir. 2012); *see also Imbler v. Pachtman*, 424 U.S. 409, 431 (1976) ("[I]n initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983."). Absolute immunity "broadly cover[s] all conduct associated with the judicial phase of the criminal process." *Bianchi v. McQueen*, 818 F.3d 309, 316 (7th Cir. 2016).

As an initial matter, the Court notes that Brodsky does not respond to or dispute the Prosecutor Defendants' argument that all of their alleged conduct was "unquestionably part of the judicial phase of the criminal process" and fell "squarely within a prosecutor's duties and role as an advocate for the State." Doc. 56 at 15. Brodsky's failure to respond to the Prosecutor Defendants' argument "results in waiver." *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir.

2010); *Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir. 1999) ("If [a court] is given plausible reasons for dismissing a complaint, [the court is] not going to do the plaintiff's research and try to discover whether there might be something to say against the defendants' reasoning.").

With respect to Elward, the Court agrees that his allegedly wrongful conduct fell into the scope of his prosecutorial duties. Starting with Elward's call to Brodsky, in which he offered to "drop the criminal contempt case if the Plaintiff agreed not to talk to anyone about any aspect of the Drew Peterson case," Doc. 7 ¶ 45, this "was essentially plea bargaining, and that is a core prosecutorial function protected by absolute immunity." *Soulier v. Haukaas*, 477 F. App'x 388, 390 (7th Cir. 2012). Brodsky also alleges that Elward made various misrepresentations in court, including that (1) Brodsky could face incarceration if he continued speaking about the Peterson case, (2) Brodsky had publicly spoken about his representation of Peterson on March 6, 2024, and (3) the circuit court did not enter a gag order on April 4, 2024. Doc. 7 ¶¶ 46–52. Given that Elward made these statements "in court and on the record" in his capacity as special prosecutor, *id.* ¶¶ 46–47, 52, they were undoubtably associated with the judicial phase of the criminal process. And the fact that these statements were allegedly misrepresentative does not change this conclusion. *See Smyjunas v. Indiana*, No. 3:25CV738, 2026 WL 1583929, at *4 (N.D. Ind. June 3, 2026) (holding that defendant "enjoys prosecutorial immunity," even where he allegedly "violated his prosecutorial oath . . . when making statements in court" because "presenting the state's case is what state prosecutors do"). For this reason, Elward's conduct falls within the scope of absolute prosecutorial immunity.

None of Brodsky's arguments to the contrary are persuasive. Brodsky first argues that Elward "was not acting as an independent prosecutor, but was acting as an agent of the

[Prosecutor] Defendants and Public Defender Defendants." Doc. 84 at 7. But Brodsky provides no explanation or authority to support the proposition that absolute prosecutorial immunity is available only to independent prosecutors, and the Court therefore gives this argument no credit. *See Puffer*, 675 F.3d at 718; *Gross*, 619 F.3d at 704.

Next, Brodsky argues that Elward is not entitled to absolute prosecutorial immunity because he "acted like a mafioso whose job it was to silence Plaintiff by abusing and misusing his position of power." Doc. 84 at 9–10. This argument fails, because "absolute immunity shields prosecutors even if they act 'maliciously, unreasonably, without probable cause, or even on the basis of false testimony or evidence.'" *Smith v. Power*, 346 F.3d 740, 743 (7th Cir. 2003) (quoting *Henry v. Farmer City State Bank*, 808 F.2d 1228, 1238 (7th Cir. 1986)); *see also Vitellaro v. City of Park Ridge*, No. 24-CV-04797, 2025 WL 2176961, at *4 (N.D. Ill. July 31, 2025) ("[A]bsolute immunity applies regardless of [the prosecutor's] motives for bringing and sustaining the charges."). Indeed, absolute immunity bars claims "arising out of even unquestionably illegal or improper conduct if the challenged action is part of the normal duties of the prosecutor." *Soulier*, 477 F. App'x at 390 (citation omitted); *see also Fields*, 672 F.3d at 516 ("Though a charged unconstitutional act, [the prosecutor's conduct] in this case was intimately associated with the judicial phase of the criminal process and is, therefore, immune from civil suit.").

Finally, Brodsky cites three cases for the proposition that "[a] state's attorney who is part of a conspiracy that targets a person for prosecution, and engages in wrongful conduct in bringing the case, is not entitled to absolute immunity." Doc. 84 at 10 (citing *Johnson v. Dossey*, 515 F.3d 778 (7th Cir. 2008); *Hill v. City of Chicago*, No. 06 C 6772, 2009 WL 174994 (N.D. Ill. Jan. 26, 2009); *Kitchen v. Burge*, 781 F. Supp. 2d 721 (N.D. Ill. 2011)). These cases do not

move the needle, however, because they simply stand for the unremarkable proposition that "[a] prosecutor is shielded by absolute immunity when he acts as an advocate for the State but not when his acts are investigative and unrelated to the preparation and initiation of judicial proceedings." *Kitchen*, 781 F.Supp.2d at 730; *see also Hill*, 2009 WL 174994, at *11 ("[A] prosecutor involved in a conspiracy to target a criminal suspect is not protected by absolute immunity" because such conduct is "investigative and unrelated to the preparation and initiation of judicial proceedings"). Brodsky does not argue—and the Court sees no reason to conclude—that Elward's allegedly wrongful conduct was investigative in nature, making these cases inapposite.

For these reasons, the Court dismisses the claim against the Prosecutor Defendants and Elward.[4]

### B. Public Defender Defendants

Next, the Public Defender Defendants argue that Brodsky has failed to state a § 1983 claim against them because he does not plausibly allege that they acted under color of state law. To state a claim for relief under § 1983, a plaintiff must establish that the defendant acted "under color of state law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999). Action under color of state law requires that the defendant "be a person who may fairly be said to be a state actor." *Id.* (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982)). "Merely

---

[4] Brodsky also filed a supplemental response to Defendants' motion to dismiss, claiming that Elward recently viewed Brodsky's LinkedIn account without concealing his identity. Doc. 93 ¶ 3. Brodsky argues that this action was "clearly outside of [Elward's] role as a prosecutor, and therefore neither absolute nor qualified immunity apply." *Id.* ¶ 6. But claims regarding the alleged chilling effect of Elward viewing Brodsky's LinkedIn profile in August 2026 are not at issue in this case, and the Court therefore disregards this argument as irrelevant.

private conduct, no matter how discriminatory or wrongful," is not action "under color of state law." *Id.*

Brodsky makes two different arguments as to why the Public Defender Defendants acted under color of state law, which the Court addresses in turn. First, Brodsky argues that the Public Defender Defendants "worked in concert with, conspired with, and colluded [with]" the Prosecutor Defendants and Elward to violate Brodsky's constitutional rights. Doc. 84 at 13–14. A private citizen "may be held liable under § 1983 for acting under color of state law if the citizen conspires with a state actor." *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1016 (7th Cir. 2000) (citing *Bowman v. City of Franklin*, 980 F.2d 1104, 1107 (7th Cir. 1992)). To establish § 1983 liability on these grounds, a plaintiff must plausibly allege that "(1) a state official and private individual(s) reached an understanding to deprive the plaintiff of his constitutional rights, and (2) those individual(s) were willful participants in joint activity with the State or its agents." *Id.* "[I]t is not sufficient to allege that the (private and state) defendants merely acted in concert or with a common goal." *Tarkowski v. Robert Bartlett Realty Co.*, 644 F.2d 1204, 1206 (7th Cir. 1980) (quoting *Sparkman v. McFarlin*, 601 F.2d 261, 268 (7th Cir. 1979)). "There must be allegations that the defendants had directed themselves toward an unconstitutional action by virtue of a mutual understanding," and plaintiff must support this with "some factual allegations suggesting such a 'meeting of the minds.'" *Id.* (quoting *Sparkman*, 601 F.2d at 268).

Here, Brodsky fails to provide sufficient factual allegations to plausibly allege the existence of a conspiracy. At best, Brodsky speculates about Defendants' shared motivations and alleges that three of the Public Defender Defendants were "present in court on April 4, 2024 and on December 5, 2024 to support Elward." Doc. 7 ¶ 53. To conclude that Defendants had a mutual understanding to deprive Brodsky of his constitutional rights, based on these minimal

allegations alone, would require significant "imagination and speculation," to say the least. *Turner v. City of Chicago*, No. 12 C 9994, 2013 WL 4052607, at *6 (N.D. Ill. Aug. 12, 2013). For this reason, Brodsky has failed to plausibly allege that the Public Defender Defendants conspired with a state actor for the purposes of § 1983 liability. *Id.* (finding that plaintiffs failed to sufficiently plead a conspiracy claim because conspiracy allegations were conclusory and threadbare and failed to demonstrate any type of agreement); *see also Thompson v. Vill. of Monee*, No. 12 C 5020, 2013 WL 3337801, at *7–8 (N.D. Ill. July 1, 2013) (dismissing complaint against private party where plaintiff made "only conclusory allegations regarding any agreement" between the private party and state official); *Tabet v. Mill Run Tours, Inc.*, No. 10-CV-4606, 2011 WL 1118713, at *4 (N.D. Ill. Mar. 28, 2011) ("Plaintiff's bare allegations of a conspiracy, without any additional allegations which support a conspiracy theory, are insufficient to demonstrate the concerted action needed to show that the Run Mill Defendants were acting under color of state law.").

Second, Brodsky argues that the Public Defender Defendants were state actors themselves because they all either "represented [Peterson] as appointed state officers of the Public Defender's office" or worked as "employee[s] of the Public Defender's office." Doc. 84 at 14. Brodsky notably provides no authority to support this argument, nor can he. The Supreme Court has confirmed that a public defender is "not, by virtue of being an officer of the court, a state actor 'under color of state law' within the meaning of § 1983." *Polk Cnty. v. Dodson*, 454 U.S. 312, 318 (1981). A public defender's work "advancing 'the undivided interests of his client' . . . is essentially a private function, traditionally filled by retained counsel, for which state office and authority are not needed." *Id.* at 318–19. This is so even where the public defender was court-appointed. *Id.* at 325; *see also McDonald v. White*, 465 F. App'x 544, 548 (7th Cir.

2012) ("[A] court-appointed public defender is not a state actor, and thus cannot be sued under 42 U.S.C. § 1983.").

The Court therefore dismisses Brodsky's § 1983 claim against the Public Defender Defendants.[5]

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motions to dismiss [54, 56, 62].

Dated: September 4, 2026

SARA L. ELLIS
United States District Judge

[5] Because Brodsky does not plausibly allege that the Public Defender Defendants acted under color of state law and absolute prosecutorial immunity bars the claim against Elward and the Prosecutor Defendants, the Court does not address Defendants' additional arguments at this time.